UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | |
| | ) | Case No. 1:07-cr-96 |
| v. | ) | *Collier / Lee* |
| | ) | |
| TRACY FEAGAN | ) | |
|    also known as "Tray" | ) | |

**REPORT AND RECOMMENDATION**

**I.     Introduction**

Defendant Tracy Feagan ("Defendant") filed a motion to suppress the fruits of the search of his residence located at 2237 6th Street NW, Birmingham, Alabama [Doc. 108] and a motion to suppress his August 25, 2007, post-initial-appearance statement [Doc. No. 116], which have been referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 156 & 161]. The parties have filed memoranda addressing the issues raised in the pending motions [Doc. 109, 117, 118, 119 & 168], which have been carefully reviewed and fully considered. In addition, an evidentiary hearing with respect to the motion to suppress Defendant's statement was held on June 18, 2008. In summary, I find no constitutional violation with respect to the issues raised in the pending motions. Thus, for the reasons set forth herein, I **RECOMMEND** that both of Defendant's motions to suppress be **DENIED**.

## II.   Background

A two-count second superceding indictment was returned against Defendant [Doc. 65]. Count One charges Defendant with conspiring to distribute five hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine and five kilograms or more of a mixture or substance containing a detectable amount of cocaine hydrochloride in violation of 21 U.S.C. §§ 846, 841(b)(1)(A). Count Two charges Defendant with conspiring to conduct and attempt to conduct financial transactions affecting interstate commerce which involved proceeds of the unlawful activity described in Count One in violation of 18 U.S.C. § 1956(h).

## III.   Evidence

### A.   Testimony at the June 18, 2008 Hearing

The United States called the sole witness during the hearing held June 18, 2008, Special Agent Joshua Melton ("SA Melton") of the Chattanooga Resident Office of the Drug Enforcement Administration ("DEA"). Defendant called no witnesses and presented no documents during the hearing.[1]

After briefly stating his experience in law enforcement, SA Melton testified to the following: SA Melton was the case agent in an investigation of an alleged methamphetamine conspiracy. During his investigation, he developed and utilized information obtained from intercepted text messages, co-defendant Harry Goff ("Goff"), and others concerning the Defendant's alleged involvement in the distribution of multi-kilograms of cocaine. Under the direction of SA Melton,

---

[1] At the conclusion of the hearing, Defendant made a nonsensical statement that he was acting as "an authorized representative"of the person named in the indictment and he accepted SA Melton's offer of testimony and account of events "for value." Defendant also filed *pro se* a "Non-Negotiable Notice of Acceptance." Local Rule 83.4(c) prohibits consideration of such *pro se* filings because Defendant is represented by retained counsel. For that reason, the *pro se* notice has no effect. Even if it were to be considered, however, Defendant's *pro se* notice, like his in-court statement, contains no information relevant to the pending motions.

Goff made a series of controlled, recorded telephone calls to "Tray." Defendant was later identified as "Tray."

During the controlled calls, Goff and "Tray" agreed to meet on August 24, 2007, at a Flying J truck stop near Birmingham, Alabama where Goff would deliver ten kilograms of cocaine to "Tray" for distribution on a consignment basis and a relatively small amount of "up front" money. According to Goff, this truck stop meeting place had been used for similar prior drug trafficking activities by Tray and Goff because Tray knew a person located at the truck stop who would provide counter-surveillance and warn him of any law enforcement activity in the area.

On the afternoon of August 24, 2007, "Tray" arrived at the truck stop, but left quickly – apparently after law enforcement surveillance vehicles were spotted in the parking lot. Tray and Goff then communicated in controlled telephone calls and set up a different location for the meeting. At or near the new meeting place, Defendant fled the scene and a pursuit ensued. Officers lost sight of Defendant, but soon thereafter, using information about the vehicle, officers spotted Defendant and a stop was performed. Officers searched Defendant's vehicle and found three cellular telephones, including one cellular telephone with the phone number used by Goff to contact "Tray." Defendant was placed under arrest by Jefferson County, Alabama police officers around 4:00 p.m., central time.

When SA Melton arrived "minutes later" at the scene of the arrest, Defendant was handcuffed and sitting in the back of a patrol car. SA Melton called Defendant "Tray" and Defendant denied he was "Tray" and said his son's name was "Tray." SA Melton did not question Defendant at the scene and does not know if he was given a *Miranda* warning at the time of his arrest.

After about 20 minutes, officers transported Defendant from the scene of the arrest to an

interrogation room in the DEA Office in Birmingham. SA Melton and two other officers interrogated Defendant for about an hour. SA Melton advised Defendant of his *Miranda* rights and Defendant said he did not want an attorney because he was "like an attorney" himself. SA Melton did not present a written waiver of rights form or record the interview of Defendant at the DEA Office in Birmingham. Defendant initially maintained that he was neither "Tray" nor part of a drug organization. Defendant also initially denied the cellular telephones found in his vehicle belonged to him or that he had recently spoken to Goff on one of the cellular telephones. Defendant eventually admitted he had driven the vehicle he was arrested in all day, he owned the cellular telephones recovered from his person and the vehicle, he was selling small amounts of marijuana, and he was known as "Tray." While Defendant made several admissions during this interrogation, Defendant did not give a detailed statement and he continued to deny involvement in a cocaine conspiracy. After approximately an hour of interrogation, and without invoking his right to counsel, Defendant declined to answer further questions stating he was tired.

Agents then drove Defendant from Birmingham to Chattanooga. During this two hour trip, SA Melton continued, off and on, to interrogate Defendant and Defendant continued to ask questions about his case/situation. At various times during the drive, Defendant stopped talking and either fell asleep or pretended to sleep. Also at various times during the drive, Defendant initiated further conversation by repeatedly asking, "What do you want from me?"[2] SA Melton responded that he wanted honest information and was interested in obtaining Defendant's help in the investigation of other members of the drug trafficking organization, such as making controlled telephone calls, buys and deliveries. SA Melton told Defendant his window of opportunity for cooperation would soon close because it would be difficult to use his assistance if too much time elapsed. Defendant said

---

[2] No documents/reports were created by SA Melton memorializing this repeated question.

he wanted to provide information that would be helpful, however, he continued to deny involvement in the sale of cocaine.

During the drive to Chattanooga, SA Melton called Assistant United States Attorney Steven Neff ("AUSA Neff") to address Defendant's questions about how cooperation might assist him because SA Melton thought AUSA Neff could better respond to that inquiry. AUSA Neff spoke to Defendant over the speaker-phone about the significance of the charges against Defendant and substantial assistance issues. He told Defendant the "window of opportunity" for cooperation would close upon arrival at the Hamilton County Jail, because immediate cooperation more often resulted in substantial assistance. AUSA Neff also told Defendant he could make no promises to him. Defendant then indicated to SA Melton that he did know some information about cocaine trafficking, but said that he wanted to wait until the next day to talk because he was tired. Defendant never said he wanted an attorney or did not want to talk further. Defendant was booked into the Hamilton County Jail that night.

The following morning, Saturday, August 25, 2007, SA Melton and AUSA Neff presented a criminal complaint charging Defendant to United States Magistrate Judge William B. Mitchell Carter. Based on the information provided with respect to the criminal complaint, Judge Carter issued an arrest warrant. Judge Carter then traveled with SA Melton and AUSA Neff to the Hamilton County Jail where Defendant's initial appearance was held.[3] During the initial appearance, Judge Carter advised Defendant of the charges, his right to have an attorney, and his right to remain silent. Defendant indicated he wanted an attorney and that he planned to retain counsel if possible. After the conclusion of the hearing, and as the hearing participants were

---

[3] A transcript of the initial appearance appears in the record and has been reviewed for purposes of this report and recommendation [Doc. 125].

starting to leave the room, Defendant asked SA Melton, "Aren't you going to stay and talk to me?" This statement was made in the presence of AUSA Neff and Judge Carter. SA Melton deferred to AUSA Neff to answer Defendant's inquiry and AUSA Neff reminded Defendant that he had just requested an attorney during the initial appearance. AUSA Neff asked if Defendant now wanted to talk to SA Melton without an attorney. Defendant responded he did and stated he wanted to tell SA Melton "something." AUSA Neff said he would talk to SA Melton about the situation, and SA Melton would return shortly if he wanted to talk to Defendant. There was no discussion of getting an attorney, such as an assistant federal defender, for Defendant prior to the requested conversation with SA Melton.

About an hour later, SA Melton returned to interview Defendant. SA Melton asked Deputy Darber of the Hamilton County Sheriff's Department to be a witness to his advisement of *Miranda* rights to Defendant and to Defendant's waiver of rights. SA Melton and Deputy Darber entered the interview room, which was the same room where the initial appearance was previously held, and SA Melton re-advised Defendant of his *Miranda* rights. Defendant waived his rights orally, said he would sign the rights waiver form presented to him later, and said he wanted to talk to SA Melton. SA Melton again advised Defendant that no promises could be made concerning Defendant's cooperation. Deputy Darber then left the room to attend to other duties. SA Melton denied ever saying or indicating to Defendant that this interview would be "off the record" or like a proffer session, that incriminating statements by Defendant would not be used against him, or that he would not tape record or take notes during the interview. During the ensuing interrogation, which lasted about two hours, Defendant confessed to his involvement in cocaine trafficking and made other incriminating statements.

SA Melton does not typically record his interrogations and he did not record his interrogation

of Defendant. He did take five pages of notes during the interview. In addition, Defendant provided two diagrams, which SA Melton included as part of his notes. These seven pages of notes were introduced as Exhibit 2.[4] Defendant signed the rights waiver form at the end of the interview, which was introduced as Exhibit 1.

### B. The Affidavit

Officer James Wigley, Jr. ("TFO Wigley"), a task force agent assigned to the DEA, executed an affidavit outlining his nine years of experience in investigating hundreds of narcotics cases, his knowledge of the day-to-day activities and items needed to conduct the drug trade business, and his training to keep current in the trends, methods, and habits of person engaged in illegal narcotics trafficking [Doc. 108-2 at 4]. TFO Wigley's affidavit states that based on his training and experience, he knows drug traffickers hide their activities through certain methods, but also maintain records and other evidence of drug trafficking such as caches of metals, jewelry and other items of value relating to money derived from drug trafficking, photographs or videotapes related to drug trafficking, and scales and other equipment used in drug trafficking, in various places, including their residences [*id.* at 4-6].

TFO Wigley's affidavit states on August 23, 2007, SA Melton requested assistance with respect to a long term investigation of a methamphetamine manufacturing and trafficking organization. As a result of his investigation and recent arrests, SA Melton had received information from a defendant source of information ("SOI"), who was a truck driver, that he had made several deliveries of cocaine to "Trey"[5] in Birmingham and Trussville, Alabama. The deliveries were

---

[4] On August 29, 2007, SA Melton completed a ten-page Report of Investigation form [Doc. 116-2], which provided in-depth details of the August 25 interrogation.

[5] In the search warrant application, the Defendant's alias is referred to as "Trey."

normally between two to nine kilograms of cocaine.

Beginning August 22, 2007, the SOI engaged in a series of controlled telephone calls with a person identified as "Trey" at an identified telephone number. When the SOI asked if he needed anything, "Trey" said he would take his normal ten kilograms. The affidavit also states the kilograms of cocaine were normally provided to "Trey" on consignment and "Trey" would later provide the SOI with money for the drugs. On August 24, 2007, the SOI placed a series of controlled calls to "Trey" to arrange a meeting at the Flying J truck stop so "Trey" could obtain the cocaine. "Trey" called the SOI later and said police were in the truck stop parking lot and "Trey" identified two of the surveillance vehicles in place at the truck stop. "Trey" and the SOI arranged another meeting place in a series of calls from two identified phone numbers.

The affidavit then describes the flight and eventual detention of "Trey" who was determined to be the Defendant. The affidavit also states a cellular telephone used by "Trey" to communicate with the SOI was located in Defendant's vehicle upon apprehension. In addition, a note addressed to "Trey" was located in the vehicle driven by Defendant.

The affidavit also describes the steps taken to determine a home address for Defendant and his wife, including arrival at Defendant's residence. At Defendant's residence law enforcement officers encountered Defendant's wife, who indicated Defendant lived there and his personal property was located inside the residence.

A state judge for the district court of Jefferson County, Alabama issued a search warrant for Defendant's residence [*id.*]. According to the search warrant return and inventory, officers found crack cocaine, cocaine, marijuana, guns, scales, documents and other evidence as a result of the search [Doc. 108-3].

**IV.    Analysis**

Defendant, as the proponent of the motions to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated by a challenged search or seizure. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).  It is the government's burden, however, to demonstrate by a preponderance of the evidence that a particular search and seizure is constitutional. *See United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004).  The government bears the burden of proving a suspect who has asserted his right to counsel has subsequently waived that right by initiating additional communication with law enforcement. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Mills*, 1 F.3d 414, 418 (6th Cir. 1993).

**A.    Warrant for and Search of Defendant's Residence**

Defendant argues his Fourth Amendment rights were violated because TFO Wigley's affidavit does not present sufficient evidence to establish probable cause for the search of his residence and does not show a nexus between the alleged drug activity and his residence [Doc. 109 & 168].  The Defendant also argues the good faith exception established in *United States v. Leon,* 468 U.S. 897 (1984), does not apply [*id.*].  The United States claims the affidavit contains sufficient probable cause and a nexus between the alleged crime and Defendant's residence to justify issuance of the warrant [Doc. 118].  The United States also argues the *Leon* good faith exception applies if the affidavit is found to be insufficient [*id.* at 7].  During the hearing, the parties agreed probable cause is to be determined based upon the facts set forth in the four corners of TFO Wigley's affidavit.[6]

---

[6] Defendant does *not* contend there are any misrepresentations in the affidavit made knowingly or intentionally by TFO Wigley.  During the June 18, 2008 hearing, Defendant, through counsel, agreed a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-57 (1978), was neither requested nor required.

### 1. Probable Cause Including A Nexus

The Fourth Amendment mandates a search warrant be based "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. amend. IV*. To justify the issuance of a search warrant, facts must be set forth which indicate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal citations omitted); *accord United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir.), *cert. denied*, 546 U.S. 813 (2005). The reviewing court must consider the totality of the circumstances as set out in the four corners of the affidavit supporting the search warrant application and answer "the commonsense, practical question [of] whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Illinois v. Gates*, 462 U.S. 213, 230 (1983); *accord United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998), *cert. denied*, 526 U.S. 1077 (1999); *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 568 n.8 (1971) (court limited to review of affidavit itself); *Frazier*, 423 F.3d at 531. The issuing magistrate's "determination of probable cause is afforded great deference" and should be overturned "only if [he] arbitrarily exercised his discretion." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004).

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.), *cert. denied*, 543 U.S. 851 (2004) (quoting *Van Shutters*, 163 F.3d at 336-37)). The "critical element in a reasonable search is not that the owner of the property is suspected of crime, but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *United States v. Pinson*, 321 F.3d 558, 564 (6th Cir.), *cert.*

*denied*, 540 U.S. 912 (2003) (quoting *Zurcher v. Standford Daily*, 436 U.S. 547, 556 (1978)). Where, the affidavit has no indicia of an informant's reliability, the "courts insist that the affidavit contain substantial independent police corroboration." *Frazier*, 423 F.3d at 532.

Defendant argues the warrant to search his residence was invalid because TFO Wigley's affidavit contains only generalized statements of criminal behavior and no evidence connecting illegal activity by Defendant to the place to be searched, his residence. The United States argues the warrant was validly issued because the supporting affidavit contained corroborated evidence Defendant was a "large scale" drug dealer with continual and ongoing operations and it was a reasonable inference he would keep evidence of such illegal activity in his residence.

Several decisions of the Sixth Circuit Court of Appeals ("Sixth Circuit") have addressed probable cause and the required nexus for the search of a residence based on the alleged drug trafficking of a resident. *See e.g., United States v. Caicedo*, 85 F.3d 1184, 1193 (6th Cir. 1996) (search upheld where experienced officer stated drug dealers often keep drugs in their homes); *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (defendant sold drugs to an informant in defendant's driveway and court concluded "[i]n the case of drug dealers, evidence is likely to be found where the drug dealers live."); *United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000) (information provided from reliable witnesses and the affiant's opinion, based on his extensive experience, that evidence would be found in the defendant's residence, was sufficient to establish probable cause for the issuance of a search warrant), *cert. denied*, 531 U.S. 880 (2000); *United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (it is reasonable to infer a drug dealer stores narcotics and equipment used in the distribution of narcotics at his home, even though no drug trafficking is observed there), *cert. denied*, 537 U.S. 1130 (2003); *United States v. Newton,* 389 F.3d 631, 636 (6th Cir. 2004) (probable cause to search a drug dealer's residence can result based upon

the reasonable inference that drug dealers maintain fruits and instrumentalities of their illegal drug activities at their residences), *vacated fro reconsideration on other grounds,* 546 U.S. 803 (2005); *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (court rejected argument that *Miggins, Blair, Jones*, and *Caicedo* provided authority to find probable cause where the affidavit was based almost exclusively on the uncorroborated testimony of unproven confidential informants – none of whom witnessed illegal activity on the premises of the proposed search – stating the allegation a defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence); *United States v. Goward*, 188 Fed. App'x 355, 358-359 (6th Cir. 2006) (even "when there is absolutely no indication of any wrongdoing occurring at that residence" there is a reasonable inference that evidence is likely to be found where drug dealers reside); *United States v. McPhearson,* 469 F.3d 518, 524-25 (6th Cir. 2006) (issuing magistrate may draw inference that evidence of wrongdoing would be found in residence where defendant was known drug dealer at the time the police sought to search home and this fact was independently corroborated, but not where there is no allegation of drug trafficking); *United States v. Kenny*, 505 F.3d. 458 (6th Cir. 2007) (holding a drug manufacturer's residence is as likely to contain drug paraphernalia and records as that of a dealer). *United States v. Gunter*, 266 F. App'x 415 (6th Cir. 2008) (a nexus exists between a known drug dealer's criminal activity and the dealer's residence when some reliable evidence exists connecting the criminal activity with the residence).

Reconciling *Miggins* and *McPhearson*, the Sixth Circuit stated:

> In [*Miggins*], we held, following a long line of precedents, that a sufficient nexus existed to search the residence of a known drug dealer after he had been arrested for possession of cocaine. As we explained in *McPhearson,* the inference that a drug dealer keeps evidence of wrongdoing in his residence can be drawn permissibly if, as in *Miggins,* the affidavit had the independently corroborated fact that the defendants were known drug dealers at the time the police sought to search their homes. In *McPhearson*, the police obtained a

> warrant to search defendant's residence after they found crack on his person in a search incident to his arrest for assault. At the time of the arrest, defendant was standing on the threshold of his residence. These were the only facts in the affidavit, and the court found that in the absence of any facts connecting McPhearson to drug trafficking, the affidavit in this case cannot support the inference that evidence of wrongdoing would be found in McPhearson's home because drugs were found on his person.

*Kenny*, 505 F.3d. at 461 (internal citations and quotations omitted).[7]

Reconciling the holdings of *Frazier*, *Miggins* and *Caicedo*, the Sixth Circuit has also stated:

> this Court's precedents establish that a nexus exists between a known drug dealer's criminal activity and the dealer's residence when some reliable evidence exists connecting the criminal activity with the residence. When, however, the only evidence of a connection between illegal activity and the residence is unreliable, such as uncorroborated statements by a confidential informant, then a warrant may not issue allowing the search of the residence.

*Gunter*, 266 F. App'x at 419 (internal citations and quotations omitted).

Applying Sixth Circuit precedents to the instant case, TFO Wigley's affidavit provides reliable evidence Defendant was a drug dealer with continual and ongoing operations. The affidavit states the SOI made controlled, monitored and recorded telephone calls to Defendant, agreeing to deliver ten kilograms of cocaine to him. The SOI's contention he had made multiple multi-kilogram

---

[7] In a recent unpublished decision involving alleged gang affiliation, gun, and drug issues, Judge McKeague, in a dissenting opinion, summarized the Sixth Circuit precedent on this issue as follows:
> As the majority opinion explains, this court's precedent establishes that probable cause to search a defendant's home exists where the defendant is a drug dealer with continual and ongoing operations. However, the allegation that the defendant is a drug dealer by an unproven confidential informant, without more, is insufficient to establish probable cause to search a defendant's residence. Additionally, probable cause does not exist to search a defendant's residence where the defendant possesses drugs but there is no allegation that he is a drug *dealer*.

*United States v. Bethal*, 245 F. App'x 460, 474-75 (6th Cir. 2007) (internal citations and quotations omitted; emphasis in original).

cocaine deliveries to Defendant was corroborated to some extent by the telephone calls and meeting arrangements, which reflected a series of drug trafficking activities between the Defendant and the SOI. Defendant does not specifically argue reliability of the SOI, but instead argues the corroboration only showed "generalized drug dealing wholly unconnected with [Defendant's] home." [Doc. 168 at 2]. This argument does not help Defendant's cause as it is a tacit admission the affidavit contains sufficient facts to show Defendant's ongoing involvement in drug dealing. As stated in the affidavit, Defendant had just ordered ten kilograms of cocaine, had a history of obtaining multiple kilograms of cocaine on consignment from the SOI, and had sufficient experience to realize covert surveillance was in place at the truck stop, and to, at least initially, successfully flee. That Defendant was involved in extensive drug trafficking was corroborated by the controlled telephone calls and the location of at least one of the telephones used in the controlled calls in Defendant's vehicle, the amount of drugs involved in the August 24 transaction, and Defendant's actions, all as outlined in the affidavit. Thus, I **FIND** the affidavit contains reliable evidence sufficient to show Defendant was a drug dealer with continual and ongoing operations in trafficking significant quantities of cocaine.

It is not necessary for this Court to conclude that the Sixth Circuit has established a firm rule that if reliable information indicates a defendant is a drug dealer, then probable cause always exists to search the drug dealer's residence. The affidavit in this case presents more. The affidavit establishes Defendant's involvement in an ongoing and continual operation, not a discrete drug transaction. Defendant's argument that there is no evidence of a connection between his residence and his "generalized drug dealing" also fails because the argument minimizes the additional fact that a law enforcement officer articulated his belief, based on experience and training about the trends, methods and habits of drug dealers, that certain evidence of drug trafficking is typically maintained

in the homes of drug dealers. Given the background and experience of TFO Wigley, and the information provided in his affidavit about the trends, habits and methods of drug dealers, it was entirely reasonable for the issuing magistrate to conclude Defendant, as a drug dealer engaged in continual and ongoing illegal drug operations, would possess fruits or instrumentalities of drug trafficking in his residence.

Giving appropriate deference to the issuing magistrate and considering the totality of the circumstances set out in the four corners of the affidavit in the commonsense manner required, I **FIND** the affidavit established a fair probability evidence of a crime would be found in the location sought to be searched, Defendant's residence. Therefore, I **CONCLUDE** the United States has met its burden of establishing probable cause for the issuance of the warrant to search Defendant's residence.

### 2. Good Faith Exception

As noted above, I have found the search warrant is valid for the reasons set forth herein. In the interest of a complete report and recommendation, however, I will also address whether the *Leon* good faith exception would apply in case the Court concludes the search warrant is invalid.

As held many times, excluding all evidence procured in violation of the Fourth Amendment would "impede unacceptably the truth finding function of judge and jury." *See e.g., Leon*, 468 U.S. at 907 (quoting *United States v. Payner*, 447 U.S. 727, 734 (1980)). Consequently, evidence obtained with an invalid search warrant that officers executed in good faith is admissible. *Id.* at 897. Under this exception, "the relevant question is whether the officer reasonably believed that the warrant was properly issued, not whether the probable cause existed in fact." *United States v. Laughton*, 409 F.3d 744, 752 (6th Cir. 2005) (quoting *United States v. Carpenter*, 360 F.3d 591, 598 (6th Cir.), *cert. denied*, 543 U.S. 851 (2004)).

Leon enumerates four situations in which an officer's reliance on a search warrant could not be presumed reasonable:

> (1) when the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and, (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid.

*Laughton*, 409 F.3d at 748 (citing *Leon*, 468 U.S. at 914-23). It appears Defendant contends the third and fourth situations are present here [Doc. 109 & 168]. The Sixth Circuit has analyzed the third and fourth situations as a single exception to *Leon's* rule of admissibility. *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 645 (6th Cir. 2003).

A warrant that lacks probable cause because there is an inadequate nexus is still valid under the good faith exception where the connection between the drug dealer and the place to be searched is not so remote as to lack indicia of probable cause. *See United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994); *Frazier*, 423 F.3d at 536-37; *Van Shutters*, 163 F.3d at 331, 337-38. Under the test of whether law enforcement officers reasonably believed the warrant was properly issued, not whether probable cause existed in fact, I **FIND** the affidavit states, at least, a minimally sufficient nexus to justify the officers' good faith reliance on the search warrant and it is not so lacking in factual detail or facially defective as to preclude application of the good faith exception. Consequently, I **FIND** the officers who conducted the search reasonably relied on the affidavit's legitimacy and the *Leon* exception would apply even if the affidavit were found to be insufficient to establish probable cause.

Therefore, I **RECOMMEND** Defendant's motion seeking to suppress evidence from the

search of his residence be **DENIED**.

B.  **Statement by Defendant**

Pursuant to the Fifth and Sixth Amendments to the United States Constitution, Defendant seeks to suppress the incriminating statement he made to SA Melton after his initial appearance. This is the only statement which Defendant seeks to suppress. As it relates to the Fifth Amendment, Defendant contends a violation occurred because he was deceived into believing his statement was off the record and would not be used against him [Doc. 117]. With respect to the Sixth Amendment, Defendant contends he did not initiate a discussion with law enforcement after he invoked his right to counsel at his initial appearance [*id.*]. The United States concedes Defendant's Fifth Amendment and Sixth Amendment rights to counsel had attached at the time of SA Melton's post-initial-appearance interrogation of Defendant, but contends neither right was violated [Doc. 120].

1.  **Fifth Amendment**

The Fifth Amendment provides "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." *U.S. Const. amend. V.* The Fifth Amendment protects a person from being compelled to testify against himself. *See, e.g., Miranda v. Arizona*, 384 U.S. 436, 444 (1966). If a person agrees to answer questions without counsel present after being adequately apprised of his right to counsel, then that person can be freely questioned by law enforcement. *Id.* If, however, the person makes an unequivocal request for counsel, law enforcement must cease questioning and wait until the requested lawyer is present. *Davis v. United States*, 512 U.S. 452, 458-59 (1994); *United States v. Suarez*, 263 F.3d 468, 482 (6th Cir. 2001), *cert. denied*, 535 U.S. 991 (2002). As stated in *Suarez*, "[t]he mere fact that the government is aware that a suspect has an attorney, or is soon to have one, does not unambiguously assert the suspect's right to deal exclusively with the police through counsel during custodial interrogation. *Id.* at 483 (citing *McNeil v. Wisconsin*, 501

U.S. 171, 177-182). The Supreme Court has specifically rejected the concept of implicitly asserting a Fifth Amendment right by already having counsel. *McNeil*, 501 U.S. at 180-81. To invoke the Fifth Amendment right to counsel, a defendant must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" *Id.* at 178.

Based on the undisputed testimony of SA Melton, Defendant was advised of and knowingly, voluntarily, and intelligently waived his *Miranda* rights several times, including just prior to making the statement at issue. The testimony of SA Melton was clear, consistent, and credible that he openly took notes, did not state the interview was off the record, and did not engage in any deceptive acts voiding Defendant's waiver of his rights to remain silent and have counsel present during the interrogation. Although Defendant argues he was deceived into believing his statement was off the record and thus his waiver of *Miranda* rights was not voluntary [Doc. 117], he presented no evidence to support such an argument. Likewise, Defendant has presented no evidence to suggest he expressed a desire for the assistance of an attorney in dealing with SA Melton's custodial interrogation after the initial appearance or to undermine the testimony of SA Melton regarding the Defendant's oral and then written waiver of his right to counsel.

For the reasons stated above and in light of no contrary evidence, I **CONCLUDE** Defendant's Fifth Amendment argument fails.

### 2. Sixth Amendment

The Sixth Amendment provides "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." *U.S. Const. amend. VI.* The Sixth Amendment right to counsel attaches when prosecution is commenced, *see, e.g., McNeil*, 501 U.S. at 175, and the United States does not dispute the Defendant's Sixth Amendment right to counsel

had attached at the time of SA Melton's post-initial-appearance interrogation of Defendant as noted above.

As held by the Sixth Circuit, "[o]nce the Sixth Amendment right attaches, any governmental attempt to elicit information from the accused without the defendant's lawyer present, even through means that may be permissible under the Fifth Amendment right to counsel prior to the point at which the Sixth Amendment right to counsel attaches (*e.g.,* electronic monitoring of a suspect's conversations with others), is prohibited." *Mitzel v. Tate*, 267 F.3d 524, 532 (6th Cir. 2001). Once the Sixth Amendment right to counsel has attached for a particular charge, law enforcement officials may not use as evidence incriminating statements deliberately elicited from the accused without the presence or waiver of counsel. *See Maine v. Moulton*, 474 U.S. 159, 176 (1985). However, nothing in the Sixth Amendment prevents an accused from choosing, on his own, to speak with law enforcement in the absence of a requested attorney. *Michigan v. Harvey*, 494 U.S. 344, 352-53 (1990).

If a defendant indicates a desire for a general discussion of the case or investigation, a defendant will have initiated the conversation and the defendant's waiver of the right to counsel is valid. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983); *Hill v. Brigano*, 199 F.3d 833, 840 (6th Cir. 1999); *United States v. Mills,* 1 F.3d 414, 418 (6th Cir. 1993). The facts of *Mills* are similar to the case at bar, as argued by the United States. In *Mills*, a defendant gave an incriminating statement to law enforcement immediately following the conclusion of her arraignment and after the attachment of her Sixth Amendment rights. Similar to the Defendant's actions in the instant case, in *Mills* the defendant asked to speak to agents right after the court had advised her about her constitutional rights and the charges and had appointed an attorney for her. Although her appointed attorney was not present during the defendant's post-arraignment interview in *Mills*, the Sixth

Circuit declined to suppress her statements because she initiated the conversation, not the agents. *Id.* at 419.

SA Melton's testimony is clear that Defendant initiated the post-initial-appearance interview. No evidence has been offered by Defendant to refute SA Melton's testimony. Therefore, because Defendant initiated the post-initial-appearance interview and waived his right to counsel during the interview, I **CONCLUDE** Defendant's Sixth Amendment argument also fails and I **RECOMMEND** Defendant's motion to suppress his post-initial-appearance statement be **DENIED**.

## V. Conclusion

For the reasons stated herein, I **RECOMMEND** that both of Defendant's motions to suppress [Doc.108 & 116] be **DENIED**.[8]

                                                    s/*Susan K. Lee*
                                                    SUSAN K. LEE
                                                    UNITED STATES MAGISTRATE JUDGE

---

[8] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).